# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HENRI MAALOUF, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN <br> and <br> IRANIAN MINISTRY OF <br> INFORMATION AND SECURITY, <br><br> Defendants. | Civil Action No. 16-280 (JDB) |
| KENNETH MARK SALAZAR <br> and <br> KEVIN MICHAEL SALAZAR, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | Civil Action No. 16-1507 (JDB) |

## MEMORANDUM OPINION

If a defendant refuses on principle to appear in court, things usually do not end well for the defendant. But suppose we add two complicating factors. First, the lawsuit is clearly untimely under governing law. And second, the defendant is the Islamic Republic of Iran. Should a court rule against Iran in absentia? Or should the court consider the suit's timeliness on its own initiative? That is the question before this Court in the above-captioned cases, in which plaintiffs seek judgments against Iran for supporting the 1983 and 1984 U.S. embassy bombings in Beirut. Generally, it is up to the defendant to raise a timeliness defense. However, the Court finds that respect for other sovereign nations, the Court's duty to independently assess claims of state-sponsored terrorism, and the practical effect of ignoring the statutory deadline weigh against

1

granting default judgments against Iran on plainly untimely claims. Hence, for the reasons explained below, the Court will set aside the defaults and dismiss the claims against Iran in both cases.

## I. BACKGROUND

On April 18, 1983, a car bomb exploded at the U.S. embassy in Beirut, Lebanon, killing sixty-three people and injuring over one hundred more. Over a year later, on September 20, 1984, a second bomb exploded at the U.S. embassy annex in East Beirut, killing at least eleven people and injuring over fifty. In 2002 and 2008, two sets of plaintiffs timely filed cases on behalf of (among others) the same bombing victims who are at the center of the two instant cases. See Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 16–17 & n.6 (D.D.C. 2011); Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 107 (D.D.C. 2005); Am. Compl. [Maalouf ECF No. 13] ¶¶ 2–3. The plaintiffs relied on the "terrorism exception" embedded in the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–11, which eliminates immunity in cases seeking damages against designated state sponsors of terrorism for (among other things) providing "material support or resources" for acts of "extrajudicial killing." 28 U.S.C. § 1605(a)(7) (2006).[1]

Iran, though served process, never appeared in either Salazar or Doe, and so defaulted. Following ex parte hearings under 28 U.S.C. § 1608(e), the Court concluded that Iran was not immune from suit in either case, and that Iran was liable to the victims of the 1983 and 1984 bombings. Doe, 808 F. Supp. 2d at 23–24; Salazar, 370 F. Supp. 2d at 117. This Court entered final judgments in the Salazar and Doe cases in May 2005 and May 2013, respectively, awarding a total of $18.3 million in compensatory damages in the former and over $8.4 billion in

---

[1] Congress later amended this exception, codifying the new version at 28 U.S.C. § 1605A. National Defense Authorization Act (NDAA) of 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).

compensatory and punitive damages in the latter.  See Estate of Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180, 183–84 (D.D.C. 2013); Order, Salazar, No. 1:02-cv-0558 [ECF No. 27].  Because Iran never appeared, the judgments against it were not appealed.

The current two cases are nearly identical to Salazar and Doe, but are brought by different family members of each bombing victim.  They were filed in February 2016 (Maalouf) and July 2016 (Salazar)—eight and fourteen years, respectively, after their predecessor suits were filed.  According to the allegations in the complaints, which the Court for now assumes are true, plaintiff Henri Maalouf (a Lebanese citizen) is the older brother of Edward Maalouf, a security guard killed in the embassy annex bombing in 1984.  Maalouf Am. Compl. ¶ 9.  He was unaware of the Doe suit because he had lost contact with his family, and now—along with the estates of his sister and parents—sues Iran and the Iranian Ministry of Information and Security for causing Edward's death, for loss of solatium, and for intentional infliction of emotional distress.  Id. ¶¶ 4, 10–12, 28–40.  Plaintiffs Kenneth and Kevin Salazar (both American citizens) are the twin sons of Mark Salazar, a staff sergeant killed in the 1983 embassy bombing.  Compl. [Salazar ECF No. 1] ¶ 11.  They, likewise, were unaware of the Salazar suit: they allege that Donna Salazar, the plaintiff in that suit, claimed that she was Mark's widow when the two were not legally married, and that she did not inform Kenneth and Kevin of her case.  Id. ¶¶ 3–7.  They now sue Iran for causing Mark's death and for intentional infliction of emotional distress.  Id. ¶¶ 26–33.

Iran has never appeared in any of the cases arising out of these bombings, including these two.  Plaintiffs have filed default judgment motions against defendants in both suits, and argued in those motions that judgment should not be withheld because of the statute of limitations.  See Pls.' Mot. for Default J. ("Maalouf Mem.") [Maalouf ECF No. 31] at 6–8; Pls.' Mot. for Default

3

J. ("Salazar Mot.") [Salazar ECF No. 13] at 8–10.[2] Those motions are fully briefed and ripe for joint decision, the issues in both being effectively identical.

## II. DISCUSSION

Before reaching the merits of plaintiffs' default judgment motions, the Court must determine whether it will consider the timeliness of their lawsuits.[3] The statute of limitations for claims brought under the terrorism exception to foreign sovereign immunity is codified at 28 U.S.C. § 1605A(b). That provision reads, in relevant part:

> An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) . . . not later than the latter of—
> **(1)** 10 years after April 24, 1996; or
> **(2)** 10 years after the date on which the cause of action arose.

28 U.S.C. § 1605A(b). Thus, an action is timely if either the action itself is timely or a "related action" was timely. If the statute of limitations has run, but the defendant has not entered an appearance, the Court must decide whether to raise the timeliness issue sua sponte.

### A. These Actions Were Not Timely

Plaintiffs do not claim that their suits are timely. Indeed, Maalouf admits that his action falls outside of the statute of limitations. Maalouf Mem. at 2.[4] This fact is equally true of the

---

[2] Maalouf also filed a memorandum responding to an order from the Court to show cause why his suit should not be dismissed as untimely. See Pl.'s Mem. in Response to the Ct.'s Order to Show Cause ("Maalouf Mem.") [Maalouf ECF No. 9]. Though filed prior to Maalouf's amended complaint, all of the arguments in that memorandum remain relevant, and the Court has therefore considered the memorandum as well as the default judgment motions.

[3] The D.C. Circuit has clarified that a court may "properly move[] the timeliness issue to the head of the line" in an FSIA case, so the Court need not first determine whether there is statutory subject-matter jurisdiction. Chalabi v. Hashemite Kingdom of Jordan, 543 F.3d 725, 728 (D.C. Cir. 2008).

[4] This admission is somewhat at odds with Maalouf's earlier claim that equitable tolling could make his suit timely. See Maalouf Mem. at 14. The Maalouf plaintiffs appear to have abandoned the equitable tolling argument in their default judgment motion when they affirmatively stated that their suit was untimely. Even if they did not, however, "a litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in

4

Salazar suit.[5]  To be timely in their own right, these actions must have been commenced not later than either (1) April 24, 2006, or (2) "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b).  These actions were filed in 2016, long after the April 24, 2006 deadline. Moreover, "the plaintiffs' causes of action arose on . . . the date[s] of the embassy bombings"; therefore, "the last day to file a new action under § 1605A was" April 18, 1993 in Salazar and September 20, 1994 in Maalouf, "ten years after the bombings."  Owens v. Republic of Sudan, 864 F.3d 751, 800 (D.C. Cir. 2017).  Since plaintiffs did not file these suits until more than two decades after those deadlines, neither is timely under § 1605A(b).

Nor was either case related to another timely action.  The FSIA allows plaintiffs to hitch their wagons to another suit that was timely filed under the predecessor provisions to the NDAA if the cases "aris[e] out of the same act or incident," and if plaintiffs filed "within 60 days of the entry of judgment in the original action or of the enactment of the NDAA, whichever was later." Owens, 864 F.3d at 765 (quoting NDAA § 1083(c)(3)).  Plaintiffs point to Salazar and Doe as the cases from which the Court should draw for its liability findings in the current Salazar and Maalouf actions, respectively—though neither set of plaintiffs argues that these cases are "related" to those for statute of limitations purposes.  See Maalouf Mot. at 2–3; Salazar Mot. at 2.  Both Salazar actions arose from the 1983 embassy bombing, and Doe and Maalouf both arose from the 1984

---

his way and prevented timely filing.'"  Menominee Indian Tribe of Wisconsin v. United States, 136 S. Ct. 750, 755 (2016) (quoting Holland v. Florida, 560 U.S. 631, 649 (2010)).  The Maalouf plaintiffs meet neither prong of this test. While Maalouf alleges that he filed as soon as possible after becoming aware of the possibility of suing Iran, see Maalouf Mem. at 14, he does not appear to have done any affirmative work to discover whether such a possibility existed.  The courts have not been "forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights."  Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990).  Nor has Maalouf alleged any "extraordinary" circumstances, "beyond [his] control," that prevented timely filing.  Menominee, 136 S. Ct. at 756.  Maalouf "had unilateral authority to present [his] claims" in the Doe case; "[p]resentment was blocked not by an obstacle outside its control, but by" Maalouf's failure to investigate.  Id.  While his failure to investigate a claim he had no idea existed is quite understandable, it does not meet the narrow test to equitably toll his suit.

[5] The Salazars also implicitly admit that their claims are untimely.  See Salazar Mem. at 8 ("[T]he subject matter jurisdiction of this Court is not defeated by the Statute of Limitations for one simple reason: limitations is an affirmative defense which is waived if not raised by the defendant.").

bombing. However, plaintiffs here did not file within sixty days of the judgments in those earlier cases. The Salazar plaintiffs filed eleven years after entry of judgment in Salazar, and the Maalouf plaintiffs filed nearly three years after entry of judgment in Doe. See Maalouf Mem. at 2 (conceding that the suit was filed too late to be "related" to Doe). Moreover, the Doe case was itself brought under the NDAA, not under the prior version of the terrorism exception as the statute of limitations requires. See Doe, 808 F. Supp. 2d at 16–17.

Because neither of the instant cases is timely in its own right, and neither is related to a timely-filed action, both run afoul of the FSIA's statute of limitations. The question remains: what, if anything, should be done about that?

### B. The Court Will Exercise Its Discretion to Dismiss the Claims Against Iran

Statutes of limitations are affirmative defenses, meaning that normally a defendant must explicitly raise the issue early on. See Fed. R. Civ. P. 8(c). If the defendant does not do so, then—in the ordinary case—the defense is forfeited. See Day v. McDonough, 547 U.S. 198, 202 (2006). Because the FSIA's statute of limitations does not implicate the Court's jurisdiction,[6] the Court is "under no obligation to raise the time bar sua sponte." Day, 547 U.S. at 205. However, "courts have the discretion . . . to raise on their own initiative certain nonjurisdictional barriers to suit," including statutes of limitations. United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 277 n.14 (2010). In the mine run of cases, courts should refrain from exercising this discretion, relying on the adversarial process to raise any non-jurisdictional issues in dispute. See Eriline Co. S.A. v. Johnson, 440 F.3d 648, 656–57 (4th Cir. 2006). But sua sponte consideration "might be

---

[6] Some statutes of limitations are jurisdictional: because Congress has written those limitations in such a way as to govern the courts' very power to hear a case, courts must dismiss any case that falls afoul of those time limits. See Owens, 864 F.3d at 801. However, the D.C. Circuit has determined that the FSIA's statute of limitations is not jurisdictional. Id. Therefore, the normal rules apply.

6

appropriate in special circumstances," particularly when an affirmative defense implicates the interests of the judiciary as well as the defendant. Arizona v. California, 530 U.S. 392, 412 (2000).

The fate of these two cases hinges on whether the circumstances presented here—untimely FSIA terrorism claims brought against an absent sovereign—are "special" enough to warrant sua sponte consideration of the statute of limitations. On this question, the ground is but lightly trodden. The Fourth Circuit has held that district courts may consider sua sponte res judicata defenses in FSIA default judgment actions. See Clodfelter v. Republic of Sudan, 720 F.3d 199, 209 (4th Cir. 2013). This Court has previously suggested that the same might be true of statute of limitations defenses. See Sheikh v. Republic of Sudan, 172 F. Supp. 3d 124, 132–33 (D.D.C. 2016). But only one case in this circuit has squarely addressed the precise question at issue, and there the court "decline[d] whatever discretionary authority it may have to raise the defense of limitations on [the absent sovereign's] behalf." Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 331 (D.D.C. 2014). For several reasons, the Court disagrees with the reasoning in Worley, and determines that it should consider the statute of limitations here.

To begin with, these cases implicate concerns about international comity that rarely appear in the ordinary lawsuit.[7] Whatever Iran's misdeeds, it remains a foreign country equal in juridical stature to the United States, and the federal courts must respect "the independence, the equality, and dignity of the sovereign." The Schooner Exch. v. McFaddon, 11 U.S. (7 Cranch) 116, 123 (1812). Comity is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 409 (1964).

---

[7] "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa, 482 U.S. 522, 544 n.27 (1987). "[T]he federal judiciary has relied on principles of comity and international law to protect foreign governments in the American legal system. This approach . . . preserves the flexibility and discretion of the political branches in conducting this country's relations with other nations." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 97 (D.C. Cir. 2002).

Thus, courts are not <u>required</u> to dismiss untimely suits against foreign sovereigns, particularly since Congress has not rendered the FSIA's statute of limitations jurisdictional. However, "the reciprocal foreign litigation interests of the United States and a concern for judicial efficiency support [a] district court's sua sponte consideration of" the statute of limitations. <u>Clodfelter</u>, 720 F.3d at 209; see <u>Sheikh</u>, 172 F. Supp. 3d at 133; cf. <u>Intel Corp. v. Advanced Micro Devices, Inc.</u>, 542 U.S. 241, 261 (2004) (stating, in the document-production context, that "comity and parity concerns may be important as touchstones for a district court's exercise of discretion in particular cases"); <u>Republic of Argentina v. NML Capital, Ltd.</u>, 134 S. Ct. 2250, 2258 n.6 (2014) (similar).

Comity concerns are further heightened by the procedural posture of these cases. Sua sponte dismissals are more permissible in default judgment proceedings: the affirmative defense at issue has not actually been waived, and the normal adversarial model upon which the concept of affirmative defenses is based has broken down. See, e.g., <u>Taiwan Civil Rights Litig. Org. v. Kuomintang Bus. Mgmt. Comm.</u>, 486 F. App'x 671, 671–72 (9th Cir. 2012); <u>De Santis v. City of New York</u>, No. 10 Civ. 3508 (JPO), 2014 WL 228659, at *5 (S.D.N.Y. Jan. 22, 2014). Moreover, the D.C. Circuit has developed "strong policies favoring the resolution of genuine disputes on their merits," such that default judgments are disfavored. <u>Jackson v. Beech</u>, 636 F.2d 831, 835 (D.C. Cir. 1980). This is doubly so when the absent defendant is a foreign sovereign. See <u>FG Hemisphere Assocs., LLC v. Democratic Republic of Congo</u>, 447 F.3d 835, 838–39 (D.C. Cir. 2006); <u>First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda—Permanent Mission</u>, 877 F.2d 189, 196 (2d Cir. 1989); <u>Practical Concepts, Inc. v. Republic of Bolivia</u>, 811 F.2d 1543, 1551–52 & n.19 (D.C. Cir. 1987); <u>Gilmore v. Palestinian Interim Self-Gov't Auth.</u>, 675 F. Supp. 2d 104, 109 (D.D.C. 2009); <u>Acree v. Republic of Iraq</u>, 658 F. Supp. 2d 124, 127 (D.D.C. 2009); <u>Weinstein v. Islamic Republic of Iran</u>, 175 F. Supp. 2d 13, 20 (D.D.C. 2001).

Thus, "in exercising its discretion [the Court] must be particularly sensitive to suits involving foreign states, even those found to be state sponsors of terrorism." Weinstein, 175 F. Supp. 2d at 20. Indeed, particular care must be taken with state-sponsored terrorism claims, since the FSIA strikes a "careful balance" between comity and accountability, Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 822 (2018), and some "considerations of sovereign immunity . . . pertain notwithstanding [a] default," Miango v. Democratic Republic of Congo, No. CV 15-1265 (ABJ), 2018 WL 446418, at *3 (D.D.C. Jan. 16, 2018). The comity owed to foreign sovereigns, particularly in default scenarios, thus counsels in favor of raising the timeliness issue here.

Another consideration is the courts' duty to independently weigh FSIA claims. The text of the FSIA states that "[n]o judgment by default shall be entered . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The FSIA thus places the burden on the plaintiff to establish her claim even in the case of a default—"a special protection" identical to that provided to the United States in default judgment actions. Jerez v. Republic of Cuba, 775 F.3d 419, 423 (D.C. Cir. 2014); see Fed. R. Civ. P. 55(d). Unlike for the run-of-the-mill default, the FSIA obliges courts to interrogate plaintiffs' claims, see Roeder v. Islamic Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003), and "leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1047 (D.C. Cir. 2014).

Given this independent screening requirement, it is appropriate for a district court to address clear violations of the FSIA statute of limitations. Courts can and do exercise discretion to dismiss untimely claims sua sponte in other contexts in which courts play a similar gatekeeping function. See, e.g., Day, 547 U.S. at 209 (habeas petitions); United States v. Mitchell, 518 F.3d

740, 750 (10th Cir. 2008) (notices of appeal); Buchanan v. Manley, 145 F.3d 386, 388 n.4 (D.C. Cir. 1998) (complaints filed in forma pauperis); cf. Owens, 864 F.3d at 808 (addressing non-jurisdictional issue because "[t]he question presented is 'purely one of law important in the administration of federal justice' . . . and 'resolution of the issue does not depend on any additional facts not considered by the district court'" (citations omitted)). Likewise, courts in this district take seriously their responsibility under the FSIA and often explicitly determine that claims are timely even in default scenarios. See, e.g., Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 157 (D.D.C. 2017); Shoham v. Islamic Republic of Iran, No. 12-cv-508 (RCL), 2017 WL 2399454, at *16 (D.D.C. June 1, 2017); Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 64 & n.5 (D.D.C. 2015); Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 16–17 (D.D.C. 2011); Beer v. Islamic Republic of Iran, No. 08-cv-1807 (RCL), 2010 WL 5105174, at *7 & n.4 (D.D.C. Dec. 9, 2010); Wachsman ex rel. Wachsman v. Islamic Republic of Iran, 603 F. Supp. 2d 148, 155 (D.D.C. 2009). Considering timeliness is thus "of a piece with—if not necessarily compelled by"—the Court's duty to evaluate plaintiffs' claims under the FSIA. Sheikh, 172 F. Supp. 2d at 133; see Clodfelter, 720 F.3d at 210. Hence, the Court's unusual gatekeeper role supports looking at the statute of limitations here.

Finally, there are good practical reasons for bringing up timeliness sua sponte. The Worley court declined to exercise its discretion to dismiss sua sponte because it felt that Iran had to "take the consequences" of its choice not to appear. 75 F. Supp. 3d at 331. The Maaloufs argue that the same logic should apply here, given that Iran is perfectly happy to litigate cases that do not involve terrorism charges. Maalouf Mem. at 10. But plaintiffs in FSIA cases are making conscious strategic decisions as well. And without some policing of time limits, plaintiffs may seek to exploit prior decisions finding nations liable for certain conduct to later pursue large damages awards

decades after the fact. Worley itself illustrates this concern. The plaintiffs in that case sued Iran in December 2012 for its role in the 1983 Beirut bombing—a twenty-nine-year gap between injury and complaint. See Worley, 75 F. Supp. 3d at 318. To find liability, the court relied on evidence from a case decided a decade earlier. Id. at 320. The present cases are even more worrisome: Maalouf was filed thirty-one years and Salazar thirty-three years after the bombings giving rise to each suit, and they rely for most of their evidence on cases filed eight and fourteen years previously. In this way, plaintiffs can continue piggybacking off of older decisions for decades to extract multimillion dollar judgments from absent sovereigns.

For how long should such claims be allowed? From the standpoint of the judicial branch, only two principled time limits present themselves: either the ten-year statute of limitations Congress has imposed, or no time limit at all. After all, if a twenty-nine year (or a thirty-three year) gap is acceptable, there is little reason to prohibit suits brought forty, fifty, or more years after the fact.[8] The claimants could easily glean evidence of a defendant's culpability by dusting off old volumes of the Federal Supplement. As long as each crop of plaintiffs could show that they were victims or proper third-party claimants, they could continue racking up sizable damages awards for decades in response to a single act.[9] Not to mention the accoutrements that come with a judgment: attempts at worldwide asset discovery, see NML Capital, 134 S. Ct. at 2258, and

---

[8] While it may seem far-fetched to imagine cases filed so long after an injury, it is far from impossible. Substantive tort law governs who may bring FSIA suits, see Owens, 864 F.3d at 807; thus, in some cases, a victim's estate or surviving relatives can sue under the FSIA even if the victim lives out a full life after being injured long ago. Of course, the perpetrator would have to remain a state sponsor of terrorism. See 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

[9] Such decades-late claims might appear to fall prey to laches, a doctrine that prohibits "unreasonable, prejudicial delay in commencing suit." Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962, 1967 (2014). But FSIA actions seek damages, a quintessential legal remedy, and "application of the equitable defense of laches in an action at law would be novel indeed." Oneida Cty., N.Y. v. Oneida Indian Nation of New York State, 470 U.S. 226, 244 n.16 (1985); see also Petrella, 134 S. Ct. at 1973 ("Both before and after the merger of law and equity in 1938, this Court has cautioned against invoking laches to bar legal relief." (footnote omitted)). Even if it did apply, laches is itself an affirmative defense. See Fed. R. Civ. P. 8(c)(1). Attempting to use laches to avoid the statute of limitations quandary is like attempting to flee an escaped tiger by running into the lion's den.

11

tussles over attaching property either here, see Rubin, 138 S. Ct. at 821, or abroad, see Peterson v. Islamic Republic of Iran, 876 F.3d 63, 92 (2d Cir. 2017), to satisfy that judgment.

None of this, of course, is to defend the indefensible nations who defy both the laws of mankind and the authority of American courts. Nor is it to suggest that the practical concerns just outlined would justify sua sponte consideration of non-jurisdictional defenses in the ordinary case. But long experience reminds us that judgments against other nations or their citizens often have serious import for American foreign relations. See, e.g., Treaty of Paris, Gr. Brit.-U.S., art. V, Sept. 3, 1783, 8 Stat. 80 ("Congress shall earnestly recommend it to the legislatures of the respective states, to provide for the restitution of all estates, rights, and properties, which have been confiscated, belonging to real British subjects . . . ."); Oona A. Hathaway & Scott J. Shapiro, The Internationalists 33–35 (2017) (describing the role in fomenting the Mexican-American War played by unpaid judgments, awarded by an international arbitration panel, for debt claims against Mexico); see also Br. for the U.S. as Amicus Curiae Supporting Resps. at 11, Rubin, 138 S. Ct. 816 (No. 16-534) (noting "the reciprocity and other foreign-relations repercussions" of allowing plaintiffs to execute judgments against Iran by seizing Persian artifacts in American museums). The few countries subject to the FSIA's terrorism exception are also those with whom the United States has some of its most delicate diplomatic relationships. The possibility of nearly endless litigation takes on a new and more troubling dimension when paired with the murky foreign policy consequences of enabling untimely judgments.

Ultimately, considering the timeliness of an FSIA claim sua sponte is a discretionary determination, and it is justified in this instance. The Court's decision today ignores neither "the fundamental rule that statutes of limitations are generally treated as affirmative defenses that may be waived," nor "Congress's determination that the statute of limitations is not a requirement for

12

exercise of subject matter jurisdiction." Worley, 75 F. Supp. 3d at 331. Rather, it leavens those concerns with a respect for Congress's choice to set time limits on other sovereigns' liability—and, more generally, for the delicate balance Congress has struck in the FSIA between comity and culpability. In this instance, "where 'the facts supporting the statute of limitations defense are set forth in the papers plaintiff[s] [themselves] submitted,'" Walters v. Indus. & Commercial Bank of China, Ltd., 651 F.3d 280, 293 (2d Cir. 2011) (citation omitted), the Court will not grant default judgments because of the patent untimeliness of these actions.

## **CONCLUSION**

Congress may have eliminated Iran's sovereign immunity, but it did not deny Iran's sovereignty. Like all state sponsors of terrorism, Iran is liable to victims of the crimes it has committed or abetted. Yet as long as it remains a state, Iran is entitled to a certain baseline of respect from American courts. Particularly given the fraught relationship between the United States and Iran, courts must take seriously both the comity due between nations and the duty to independently scrutinize default judgment claims under the FSIA. Hence, for the reasons explained above, the Court will deny plaintiffs' motions for default judgments and instead dismiss both actions, with prejudice, as untimely. A separate order to this effect will issue in each case.

/s/
JOHN D. BATES
United States District Judge

Dated: March 30, 2018